UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

QUAMAINE DAWSON ROBINSON,

                              Plaintiff,              **OPINION AND ORDER**

        -against-                                     22 Civ. 3333 (AEK)

MICHAEL COX, *Police Officer*, IAN
GALLAGHER, *Police Officer*, COMMISSIONER
JOHN MUELLER, and CITY OF YONKERS,[1]

                      Defendants.
-------------------------------------------------------------x

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.**[2]

        Plaintiff Quamaine Dawson Robinson, proceeding *pro se*, brings this action against

Police Officer Michael Cox ("Officer Cox"), Police Officer Ian Gallagher ("Officer Gallagher"),

Commissioner John Mueller ("Commissioner Mueller" and, collectively with Officer Cox and

Officer Gallagher, the "Individual Defendants"), and the City of Yonkers.  He asserts a claim for

---

[1] While Plaintiff named the City of Yonkers Police Department as a defendant in the
operative complaint rather than the City of Yonkers, *see* ECF No. 30 ("Second Amended
Complaint" or "Second Am. Compl."), the June 16, 2023 Supplemental Order of Service, issued
by the Honorable Nelson S. Román, states that "Plaintiff's claims against the City of Yonkers
Police Department must be dismissed because, under New York Law, city agencies and
departments lack the capacity to be sued," ECF No. 31 at 2.  Accordingly, as set forth in that
order, the Court "construe[d] the complaint as asserting claims against the City of Yonkers and
direct[ed] the Clerk of Court to amend the caption of this action to replace the City of Yonkers
Police Department with the City of Yonkers."  *Id.*

        The instant motion purports to be filed on behalf of the Individual Defendants (as defined
below) and the City of Yonkers Police Department (which is no longer a party).  *See* ECF Nos.
84-87.  The motion is *not* specifically made on behalf of the City of Yonkers.  The implications
of this are addressed later in this Opinion and Order.

[2] The parties consented to this Court's jurisdiction for all purposes pursuant to 28 U.S.C.
§ 636(c) on October 30, 2023.  ECF No. 60.

excessive force under 42 U.S.C. § 1983 against Officer Cox and Officer Gallagher; a "stigma plus" claim under 42 U.S.C. § 1983 against Officer Cox, Officer Gallagher, and Commissioner Mueller; a claim for municipal liability under 42 U.S.C. § 1983 against the City of Yonkers and Commissioner Mueller; and a state law claim for defamation against Officer Cox, Officer Gallagher, Commissioner Mueller, and the City of Yonkers.[3]  *See* Second Am. Compl.[4] Currently before the Court is the Individual Defendants' motion for summary judgment.  ECF No. 84.  For the reasons that follow, the motion is GRANTED, and the action as against the Individual Defendants is dismissed with prejudice.

## BACKGROUND

### I.    Factual Background

The following facts relevant to this Opinion and Order are undisputed unless otherwise noted, and are taken from the Individual Defendants' Local Civil Rule 56.1 Statement, ECF No. 86 ("Defs.' 56.1"), as well as the Court's independent review of the evidence submitted in support of the motion.[5]

---

[3] While the Second Amended Complaint does not explicitly assert the state law defamation claim against the City of Yonkers on a theory of *respondeat superior* liability, given Plaintiff's *pro se* status, and the fact that he has brought suit against the City of Yonkers and has included allegations of defamation in his municipal liability claim, the Court liberally reads the Second Amended Complaint to include such a claim and addresses it in Section IV below.

[4] Even though the Second Amended Complaint references the First and Eighth Amendments to the United States Constitution as well, *see* Second Am. Compl. First Cause of Action ¶ 1, Second Cause of Action ¶ 1, Third Cause of Action ¶ 1, Plaintiff does not assert any claims based on the First Amendment.  And since the incident in question occurred during the course of Plaintiff's arrest, Plaintiff cannot assert any claims under the "cruel and unusual punishments" clause of the Eighth Amendment, because that clause "applies only to convicted prisoners."  *Smith v. Brown*, 296 F. Supp. 3d 648, 661 (S.D.N.Y. 2017) (quotation marks omitted).

[5] Plaintiff never filed any papers in opposition to the motion.

On May 7, 2021, at approximately 10:14 p.m., Officer Cox, Officer Gallagher and other officers from the Yonkers Police Department arrived at 95 Ravine Avenue in Yonkers, New York in response to a 911 call. Defs.' 56.1 ¶ 5. According to the Individual Defendants, the 911 caller reported that there was an individual—who appeared to be agitated—cursing at residents, kicking at car doors, and threatening to shoot everyone in sight. *Id.* ¶ 6. Plaintiff does not dispute that he was at 95 Ravine Avenue in Yonkers at that date and time, but he testified at his deposition that he was there because he had called for a cab to take him home and was waiting for it when the police arrived. ECF No. 95 ("Pl.'s Dep.") at 5:18-6:10. Plaintiff further testified that immediately beforehand, he had been at a liquor store, where he purchased alcoholic beverages; after talking to friends outside the liquor store, he walked down Ravine Avenue, ultimately ending up in front of 95 Ravine Avenue. *Id.* at 6:14-7:19. According to Plaintiff, he was talking to a friend on his phone while walking down Ravine Avenue; Plaintiff maintains that he was not shouting, was not using foul language or cursing, did not kick any of the parked cars along Ravine Avenue, and did not threaten to "shoot everyone in sight." *Id.* at 8:7-10:5.

According to the Individual Defendants, upon arriving at 95 Ravine Avenue, Yonkers Police Officers Dylan Thomas and John Wilt observed Plaintiff, who matched the description of the individual provided by the 911 caller and appeared to be intoxicated; they then proceeded to conduct a field interview. *See* ECF No. 85 (Declaration of Michael Ashraf ("Ashraf Decl.")) Ex. B ("Incident Report") at 3; Defs.' 56.1 ¶ 7. The Incident Report prepared by Officer Thomas indicates that there were 14 Yonkers police officers at the scene, including Officer Cox and Officer Gallagher, and that when Officer Thomas first approached Plaintiff, he did so "alongside" the entire group of other officers. Incident Report at 3. The Individual Defendants assert that because Plaintiff matched the description of a person who threatened to shoot people,

and because Plaintiff was behaving erratically, Officers Thomas and Wilt conducted a pat frisk of Plaintiff's outermost garments for weapons. *See id.*; *see also* Defs.' 56.1 ¶ 8.

According to Plaintiff, when the police officers first approached him, he told them that he had called a cab to go home—he explained that he was from the Bronx, but that he used to live in Yonkers and was visiting friends there. Pl.'s Dep. at 11:12-23. Plaintiff testified that the officers, with their guns drawn, instructed him to remove his hands from his pocket, but he did not, *id.* at 11:24-12:7, 14:2-5; he asked the officers why they wanted him to take his hands out of his pockets and why they wanted to search him, *id.* at 11:25-12:2. He further testified that when he refused to take his hands out of his pockets himself, the officers removed his hands from his pockets, put them behind his back, and handcuffed him. *Id.* at 14:24-16:6. Plaintiff testified that the officers then searched him by patting him down. *Id.* at 16:8-13.

In the course of the pat-down search, Officer Thomas recovered a loaded handgun from Plaintiff's person. Incident Report at 3; Defs.' 56.1 ¶ 9.[6] Also according to the Individual Defendants, after Plaintiff was found to be in possession of the loaded firearm, Officer Cox and Officer Gallagher conducted a further search of Plaintiff and then fell ill, with Officer Gallagher falling to the ground and Officer Cox sitting down on the sidewalk and appearing weak. Incident Report at 3. Both Officer Cox and Officer Gallagher were administered naloxone, and Officer

---

[6] The Incident Report states that the loaded handgun was found tucked into Plaintiff's right sock, *see* Incident Report at 3, but Plaintiff testified that it was in his pants pocket, Pl.'s Dep. at 20:10-17. This discrepancy is not material for purposes of this motion.

Cox was also administered oxygen, at the scene because of possible fentanyl exposure.  Defs.'

56.1 ¶ 10; Incident Report at 3; Ashraf Decl. Ex. C at 2; *see* Pl.'s Dep. at 21:6-22.[7]

Plaintiff testified that "the detective said that I have fentanyl and all that," but Plaintiff

"told them I did not have no fentanyl."  Pl.'s Dep. at 33:7-9; *see also id.* at 39:8-13 ("I heard the

officer say fentanyl.  When the detective came to me and said that, oh, that I have fentanyl, I told

him I never touched that drug a day in my life.").

Plaintiff testified that the detective and "another officer, while I'm in cuffs, threw me in

the back of the cop car, and I hit my head on the door."  *Id.* at 33:9-12, 51:4-17.  According to

Plaintiff, he was bleeding from the back of his head after his head struck the police vehicle.  *Id.*

at 51:4-17.  He also testified that he sustained injuries because the handcuffs were too tight

during the course of the incident.  *Id.* at 48:10-23.  Plaintiff asserts that he complained to one of

the officers on the scene, but when he did, the officer made the handcuffs even tighter and "that's

---

[7] Plaintiff's deposition testimony was as follows:

> Q.    Now, after the police recovered the firearm from your person, you
>       said that you observed some of the officers stumble or fall to the
>       ground.  Is that correct?
>
> A.    Yes.
>
> Q.    And then some emergency treatment was provided to them?
>
> A.    Yes.  I think they was given – there was Narcan.
>
> Q.    Was this done by the other officers or was an ambulance or EMT
>       called at this point?
>
> A.    I couldn't really remember because they had put me in the cop car.
>
> Q.    So they had put you in a police vehicle at this point.
>
> A.    Yeah.

Pl.'s Dep. at 21:6-22.

when they threw [him] in the cop car." *Id.* Plaintiff testified that he still has a knot in the back of his head as a result of hitting his head on the car door, as well as a "little scar" on his hand from the tight handcuffs. *Id.* at 50:20-51:3, 52:3-8. After the incident, a news article appeared which, according to the allegations in the Second Amended Complaint, stated that Plaintiff exposed Officers Cox and Gallagher to fentanyl. *See* Second Am. Compl. First Cause of Action ¶¶ 10-11, Second Cause of Action ¶¶ 10-11, Third Cause of Action ¶¶ 11-12. Plaintiff testified at his deposition, however, that the word fentanyl did not appear in the article. Pl.'s Dep. at 40:18-41:8.[8]

## II.    Procedural History

Plaintiff's original complaint was docketed on April 22, 2022. ECF No. 2. On May 16, 2022, the Honorable Laura Taylor Swain issued an order to amend, which granted Plaintiff leave to file an amended complaint that complied with the standards discussed in the order; the order instructed Plaintiff that if he failed to file an amended complaint within 60 days, and could not show good cause to excuse such failure, the lawsuit would be dismissed. ECF No. 5 at 8. Because Plaintiff failed to file his amended complaint as ordered, the action was dismissed and judgment was entered. ECF Nos. 8, 9. Plaintiff appealed the dismissal, maintaining that he never received the order to amend because he was in transit between different correctional facilities at the time, ECF No. 10; the United States Court of Appeals for the Second Circuit

---

[8] Based on Plaintiff's prior pleadings in this case, *see* ECF Nos. 2, 16, as well as certain questions asked during his deposition, *see* Pl.'s Dep. at 37:23-38:23, it is apparent that Plaintiff's allegations relate to an article published May 8, 2021 (*i.e.*, the day after the incident) by News 12 The Bronx titled, "Police: Several Yonkers officers recovering after possible drug exposure." *See* https://bronx.news12.com/police-several-yonkers-officers-recovering-after-possible-drug-exposure [https://perma.cc/C85K-MKDU] (last visited September 5, 2025). The article does not identify either Officer Cox or Officer Gallagher as the officers possibly exposed to drugs, nor does it report any statements made by Officer Cox or Officer Gallagher; rather, it reports statements made to the press by Commissioner Mueller. *See id.*

vacated the judgment and remanded the case for further proceedings, ECF No. 14.  Via an order

issued on April 12, 2023, the case was reopened, and Plaintiff was given another 60 days to file

an amended complaint, ECF No. 15; on April 26, 2023, he did so, ECF No. 16.  Plaintiff then

filed the Second Amended Complaint on June 7, 2023, which is now the operative pleading.

ECF No. 30.

      Following the completion of discovery, this Court set a briefing schedule for the filing of

a motion for summary judgment.  ECF No. 78.  In accordance with the schedule, the Individual

Defendants initially filed their motion papers on September 20, 2024.  ECF Nos. 79-82.  But

because the filing failed to comply with Local Civil Rule 56.2 of the Local Rules of the United

States District Courts for the Southern and Eastern Districts of New York, this Court ordered

counsel to re-serve and re-file the motion papers, ECF No. 83, which was done on September 24,

2024, ECF Nos. 84-89.  On November 1, 2024, Plaintiff sent a letter informing the Court of his

change of address and seeking an extension of time file his opposition to the motion.  ECF No.

90.  This Court ordered counsel to re-serve Plaintiff with the motion papers at his new address,

and set new dates for both Plaintiff's opposition submission and for the filing of a reply brief.

ECF No. 91.  When Plaintiff missed this deadline, this Court, on its own, extended the deadline

for Plaintiff to file his opposition to the motion, and when that deadline was missed, extended the

deadline again.  ECF Nos. 93, 94.  To date, no opposition has been filed.

## LEGAL STANDARDS FOR SUMMARY JUDGMENT

### I.    Summary Judgment

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be

granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Dupree v.*

*Younger*, 598 U.S. 729, 737 (2023).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, a court is required to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sloley v. VanBramer*, 945 F.3d 30, 36 (2d Cir. 2019) (cleaned up); *see also Anderson*, 477 U.S. at 261 n.2.  A party cannot overcome summary judgment by relying on "mere speculation or conjecture as to the true nature of the facts" because "conclusory allegations or denials . . . are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (cleaned up).  Moreover, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Rogoz v. City of Hartford*, 796 F.3d 236, 245-46 (2d Cir. 2015) (cleaned up).  "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000) (internal quotation marks omitted).

## II.    Filings by *Pro Se* Litigants

In addition, in cases involving *pro se* litigants, on a motion for summary judgment, the court reads the submissions of the *pro se* party "liberally and interpret[s] them to raise the strongest arguments that they suggest." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (quotation marks omitted).  Nonetheless, "application of this different standard does not relieve [the *pro se* party] of his [or her] duty to meet the requirements necessary to defeat a motion for summary judgment." *Id.* (quotation marks omitted).  Where *pro se* parties do not

adhere to Local Civil Rule 56.1 and its requirements concerning statements of undisputed facts, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules . . . [and] it may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (quotation marks omitted). "Courts in this Circuit typically forgive a *pro se* plaintiff's failure to file a Local Rule 56.1 Statement, and generally conduct their own independent review of the record." *Lloyd v. Holder*, No. 11-cv-3154 (AT), 2013 WL 6667531, at *5 (S.D.N.Y. Dec. 17, 2013).[9] Here, despite the Individual Defendants serving on Plaintiff the requisite Local Civil Rule 56.2 Notice to *Pro Se* Litigants Opposing Summary Judgment and the Court granting him multiple extensions of time, Plaintiff has never filed any papers in opposition to this motion. The Court has nonetheless undertaken a careful and thorough review of the record in reaching its decision.

## DISCUSSION

The Second Amended Complaint asserts four claims: (1) an excessive force claim under 42 U.S.C. § 1983 against Officer Cox and Officer Gallagher; (2) a "stigma plus" claim under 42 U.S.C. § 1983 against Officer Cox, Officer Gallagher, and Commissioner Mueller; (3) a claim for municipal liability under 42 U.S.C. § 1983 against the City of Yonkers and Commissioner Mueller; and (4) a state law claim for defamation against Officer Cox, Officer Gallagher, Commissioner Mueller, and the City of Yonkers. The Court addresses each of these claims in turn below.

---

[9] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) and Local Rule 7.2 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, copies of this case and other cases cited in this Opinion and Order that are unpublished or only available by electronic database are being simultaneously delivered to the *pro se* Plaintiff along with the Opinion and Order.

# I.      Excessive Force Claim

Plaintiff alleges that Officer Cox and Officer Gallagher used excessive force against him by (1) handcuffing him too tightly, leaving a "little scar" on his left hand; and (2) throwing him in the police car, causing him to hit his head on the door and bleed, and leaving a "knot" on the back of his head.  *See* Second Am. Compl. First Cause of Action ¶ 13, Second Cause of Action ¶ 13; *see also* Pl.'s Dep. at 48:10-49:6, 51:4-17, 50:20-51:3, 52:3-8.

## A.      Applicable Legal Standards

### 1.      The *Graham* Factors

When an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396 (quotation marks omitted).  Proper application of the reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  These three considerations are known as the "*Graham* factors."  *See Brown v. City of New York*, 798 F.3d 94, 100, 102 (2d Cir. 2015).

"[R]easonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"—indeed, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,

violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (cleaned up). Ultimately, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

This reasonableness inquiry is an "objective" one: "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "*Graham* thus stands for the proposition that a government officer may not intrude on a person's Fourth Amendment rights by employing a degree of force beyond that which is warranted by the objective circumstances of an arrest." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019).

### 2.    Handcuffing Claims

To determine whether a plaintiff can establish a claim for excessive force in the process of handcuffing, courts consider three evidentiary factors: whether "(1) the arrestee's handcuffs were unreasonably tight; (2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and (3) the degree of injury to the arrestee's wrists." *Id.* at 612-13 (cleaned up). But "[a] court's reasonableness analysis is not limited to a factual checklist; it must instead be guided by a careful balance between the nature and quality of the intrusion and the countervailing government interests at stake under the circumstances." *Id.* at 613 (cleaned up). "The question is more broadly whether an officer reasonably should have known during handcuffing that his [or her] use of force was excessive." *Id.* In this Circuit, "where an officer's use of force in handcuffing is plainly unreasonable under the circumstances *or* where a plaintiff manifests clear signs of [his or] her distress—verbally or otherwise—a fact finder may decide that the officer

reasonably should have known that his [or her] use of force was excessive for purposes of establishing a Fourth Amendment violation." *Id.* (emphasis in original).

### 3.    Personal Involvement of the Particular Defendants

"To establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional deprivation." *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) (cleaned up). "To do so, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* (quotation marks omitted).

### B.    Analysis

Plaintiff alleges that Officer Cox and Officer Gallagher used excessive force against him by handcuffing him too tightly and throwing him in the police car;[10] he also alleges, however, that after the officers stopped and searched him, one of them became "lightheaded," and both of them were treated for exposure to fentanyl and brought to the hospital. *See* Second Am. Compl. First Cause of Action ¶¶ 4-5 ("The officers said to put my hands on the wall and Plaintiff said for

---

[10] Plaintiff alleges as follows:

> Why [*sic*] the defendant was putting me in handcuffs force was use malicious substantial for the soul [*sic*] purpose to cause harm. When he apply the handcuffs they was so tight that the cuffs which was cutting off my blood curtation [*sic*] which left a permit [*sic*] scar on my left hand. As they was bringing me to the police car I try to tell the officer to let me pull my pants up which he grab me by my neck and threw me in the cop car which I hit my head on the back seat door which I was bleeding and have a permit [*sic*] knot on back of my head. Force was not use in good faith basics [*sic*] to maintain restore safey [*sic*] in the community. Force was use malicious for the soul [*sic*] purpose of causing harm. As a result of placing handcuffs on the wrist and the slaming [*sic*] into back of the cop car. Which lead injuries to back of my head bleeding which left a permit [*sic*] scar on back of my head.

Second Am. Compl. First Cause of Action ¶13; *see id.* Second Cause of Action ¶13 (same).

what.  They was holding me in middle of the street restraining me . . . .  During the search an officer became lightheaded, he didn't nofity [*sic*] his supervisor and both officers was treated for exposure of fentanyl."), ¶ 7 ("Plaintiff and the officers was all treated at St. John's [H]ospital by [E]mpress."); *see also id.* Second Cause of Action ¶¶ 4-5 ("Officer Cox was using excessive force with Officer Gallagher who has try [*sic*] to detain me . . . .  During the search an officer became lightheaded, he didn't nofity [*sic*] his supervisor and both officers was treated for exposure of fentanyl.").[11]

Even resolving all ambiguities and drawing all permissible factual inferences in favor of Plaintiff, the evidence in the record—including Plaintiff's own testimony—is such that no reasonable jury could find in Plaintiff's favor on his excessive force claim against Officer Cox and Officer Gallagher.  The Incident Report written by Officer Thomas indicates that there were 14 Yonkers police officers at the scene on May 7, 2021, including Officer Cox and Officer Gallagher, and that when Officer Thomas first approached Plaintiff, he did so "alongside" the entire group of other officers.  Incident Report at 3.  At no point in his deposition testimony did Plaintiff specify which officers took which actions during the course of the incident.  Instead, Plaintiff testified at his deposition that "all the officers that was [*sic*] on the scene ambushed me, and they had my hands behind my back, put it [*sic*] in cuffs"; he added that "[a]ll of them came

_____

[11] The Court does not interpret the Second Amended Complaint as asserting this claim against Commissioner Mueller individually.  There are no allegations regarding Commissioner Mueller's personal involvement in the May 7, 2021 incident, and nothing in the record before the Court suggests that Commissioner Mueller was present for the encounter at 95 Ravine Avenue.  The allegations against Commissioner Mueller in the Second Amended Complaint regarding excessive force are verbatim recitations of the allegations made against Officer Cox and Officer Gallagher.  *See* Second Am. Compl. Third Cause of Action ¶¶ 4, 5, 14.  The only unique allegations made against Commissioner Mueller are that he developed and maintained policies and customs which led to the violation of Plaintiff's constitutional rights.  *See id.* Third Cause of Action ¶¶ 2-3.  Those allegations against Commissioner Mueller are addressed in Section III below.

at [him] at once."  Pl.'s Dep. at 15:3-5, 18-22.  Plaintiff further testified that after he was

handcuffed, officers searched him and recovered a handgun from his person, *id.* at 15:25-17:5,

and that at some point after officers recovered the handgun, he saw some of them stumble or fall

to the ground, *id.* at 21:6-10.  While Plaintiff did not identify which of the 14 officers stumbled

or fell, the Incident Report makes clear that Officer Gallagher "stumble[d] and f[e]ll to the

ground," and that Officer Cox "sat down on the sidewalk and appeared weak" after performing a

further search of Plaintiff after the firearm was recovered.  Incident Report at 3; *see also* Ashraf

Decl. Ex. C at 2.  Plaintiff observed that the affected officers received emergency treatment, but

he could not remember what kind of emergency treatment because he had been placed in the

police car by then.  *Id.* at 21:11-22.  Notably, Plaintiff stated that he "asked one of the officers to

loosen the cuffs 'cause it was cutting off any circulation of my blood.  And he ignored my – he

ignored my rights and made them even more tighter, and *that's when they threw me in the cop

car.*"  *Id.* at 48:18-23 (emphasis added).

 Assuming Plaintiff has raised a material issue of fact as to whether he was subjected to

excessive force on May 7, 2021, either as a result of handcuffs being applied too tightly or from

his head being struck against the door of a police vehicle, summary judgment is warranted for

Officer Cox and Officer Gallagher as to this claim because there is no evidence in the record that

either Officer Cox or Officer Gallagher were the police officers who used any allegedly

excessive force against Plaintiff.

 First, there is no evidence in the record that Officer Cox or Officer Gallagher applied the

handcuffs to Plaintiff's wrists initially.  According to Plaintiff, he was handcuffed when he

refused to remove his hands from his pockets in response to the officers' commands, but there is

no evidence as to who placed the cuffs on Plaintiff at that time—indeed, Plaintiff testified that all

of the officers "came at [him] at once" at this stage of the incident, Pl.'s Dep. at 14:24-16:6, and the Incident Report does not specify who handcuffed Plaintiff.

Second, there is no evidence in the record that Officer Cox and/or Officer Gallagher were told by Plaintiff that the handcuffs were unreasonably tight and made them tighter, nor is there evidence that Officer Cox and/or Officer Gallagher were responsible for "throwing" Plaintiff into a police car in a manner that caused him to injure his head. What is clear from the record is that according to Plaintiff's deposition testimony, at some point after he was searched, he "asked one of the officers to loosen the cuffs," and in response, the officer made the cuffs tighter, and "that's when they threw [him] in the cop car." Pl.'s Dep. at 48:18-23. What is also clear is that immediately after Plaintiff was searched, Officer Cox and Officer Gallagher were incapacitated—with Officer Gallagher having fallen to the ground and Officer Cox appearing weak while sitting on the sidewalk—and receiving emergency treatment for suspected fentanyl exposure. *See* Incident Report at 3; Ashraf Decl. Ex. C at 2; Pl.'s Dep. at 21:6-22; *see also* Second Am. Compl. First Cause of Action ¶ 5, Second Cause of Action ¶ 5. The undisputed evidence in the record is that Officer Cox and Officer Gallagher were in no position to take any action with respect to Plaintiff in the aftermath of the search because they themselves had been sickened and required attention. Accordingly, it would not be possible for a reasonable factfinder to conclude that Officer Cox or Officer Gallagher made Plaintiff's handcuffs tighter after receiving his complaint, or that they were involved in any actions associated with placing him into the police vehicle that evening.

Because there is no evidence that Officer Cox and/or Officer Gallagher were personally involved in either of the alleged uses of excessive force, their motion for summary judgment as to this claim is GRANTED.[12]

## II.    "Stigma Plus" Claim

Plaintiff alleges that Officer Cox, Officer Gallagher, and Commissioner Mueller gave false information to both investigators and the press that he had exposed the police officers to fentanyl, even though he never possessed any fentanyl.  *See* Second Am. Compl. First Cause of Action ¶¶ 8-11, Second Cause of Action ¶¶ 8-11, Third Cause of Action ¶¶ 9-12.  More specifically, Plaintiff alleges:

> 8.  Plaintiff never had any possession of fentanyl and there was no fentanyl on my clothes which officers falsely authorized and submitting a false police report to be use part of City of Yonkers Police Department . . . .

---

[12] Plaintiff did not plead a claim for failure to intervene against either Officer Cox or Officer Gallagher, but to the extent that the Second Amended Complaint could be read to assert such a claim against either of the officers, that claim would also have to be dismissed based on the evidence before the Court.  "To establish a claim for failure to intervene, a plaintiff must show (i) the officer's failure 'permitted fellow officers to violate plaintiff's clearly established statutory or constitutional rights,' and (ii) it was 'objectively unreasonable for him [or her] to believe that his [or her] fellow officers' conduct did not violate those rights.'"  *Buchy v. City of White Plains*, No. 14-cv-1806 (VB), 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015) (quoting *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir. 1997)) (cleaned up).  "'[F]or liability to attach' for failure to intervene, 'there must have been a realistic opportunity to intervene to prevent the harm from occurring.'"  *Kayo v. Mertz*, 531 F. Supp. 3d 774, 799 (S.D.N.Y. 2021) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  When the alleged failure to intervene relates to an alleged use of excessive force, "[t]he use of force must also have been of a sufficient duration to afford the officer a reasonable opportunity to intervene." *Buchy*, 2015 WL 8207492, at *3 (quotation marks omitted).

Again, however, because the record indicates that Officer Cox and Officer Gallagher had already been sickened and incapacitated by the time any alleged use of excessive force occurred, they cannot be held liable for failing to intervene to prevent any other officer from using excessive force against Plaintiff, because they would not have had a realistic opportunity to intercede given their own condition at the time.

10. This information was giving [*sic*] to investigators.  Investigators pass false force fabricated information to the press.

(A 30 year old man Quamaine Robinson was waving a gun saying he gonna shoot everyone in sight and he was agitated and kicking car doors.  Officers was expose to fentanyl and several officers had to be hospitized [*sic*].)

11. As result of the press going off on the officers false statement misleading information.

*Id.* First Cause of Action ¶¶ 8, 10-11, Second Cause of Action ¶¶ 8, 10-11, Third Cause of Action ¶¶ 9, 11-12.

He alleges that as a result, he suffered a "defamation of character by which false statement tends to expose the Plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons and to deprive him of their friendly intercourse in society."  *Id.* First Cause of Action ¶ 12, Second Cause of Action ¶ 12, Third Cause of Action ¶ 13.  Since the outset of the case, the Court has construed these and similar allegations in prior pleadings as a "stigma plus" claim against Officers Cox and Gallagher pursuant to 42 U.S.C. § 1983.[13]  *See* ECF No. 5 at 3-4.

A.    **Applicable Legal Standards**

"[U]nder limited circumstances, federal constitutional relief is available for defamation committed by government officials."  *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010).  "Specifically, an action can be grounded in 42 U.S.C. § 1983 when [a] plaintiff can demonstrate "a stigmatizing statement plus a deprivation of a tangible interest."  *Id.* (quotation marks

---

[13] The Court construes the Second Amended Complaint as also asserting this claim against Commissioner Mueller individually based on the News 12 The Bronx article referenced in Plaintiff's various pleadings.  As explained in footnote 8, *supra*, the article appears to be based, at least in part, on statements made by Commissioner Mueller that Yonkers police officers possibly suffered drug exposure in the course of searching Plaintiff.

omitted).  "To establish a stigma plus claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights."  *Id*. (quotation marks omitted).  "This state-imposed alteration of status or burden must be in addition to the stigmatizing statement."  *Id.* (quotation marks omitted).  "Thus, even where a plaintiff's allegations would be sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process."  *Id.* (quotation marks omitted).  As the Second Circuit has explained,

> Burdens that can satisfy the "plus" prong under this doctrine include the deprivation of a plaintiff's property and the termination of a plaintiff's government employment.  Other circuits have found that direct interference with a plaintiff's business may also constitute a "plus" under this doctrine.  However, deleterious effects flowing directly from a sullied reputation, standing alone, do not constitute a "plus" under the "stigma plus" doctrine.

*Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (cleaned up).

### B.    Analysis

Plaintiff has not come forward with sufficient evidence for a reasonable jury to find in his favor on the first prong of the "stigma plus" test—that is, whether there was a statement sufficiently derogatory to injure his reputation.  Importantly, it is an element of the first prong of a "stigma plus" claim that the allegedly derogatory statement has been publicized.  *See Abramson v. Pataki*, 278 F.3d 93, 101-02 (2d Cir. 2002); *Filteau v. Prudenti*, 161 F. Supp. 3d 284, 291 n.6 (S.D.N.Y. 2016).  Plaintiff's contention is that his reputation was injured because Officer Cox, Officer Gallagher, and Commissioner Mueller specifically made false statements about Plaintiff having exposed Officer Cox and Officer Gallagher to *fentanyl*.  *See*, *e.g.*, Second

Am. Compl. First Cause of Action ¶¶ 5, 8-12.  But it is clear from the record that there is no evidence that the statements that purportedly give rise to Plaintiff's "stigma plus" claim—*i.e.*, that Plaintiff exposed Officer Cox and Officer Gallagher to fentanyl—were ever publicized.

At his deposition, Plaintiff testified that during his encounter with the police, one of the officers, or a detective, said that Plaintiff "had fentanyl," and Plaintiff told the officer that he "never had no fentanyl."  *See* Pl.'s Dep. at 21:23-23:3; *see also id.* at 38:24-39:13.  Plaintiff also confirmed at his deposition that the only statements he was aware of about him having exposed the officers to fentanyl were made at the scene of the May 7, 2021 incident, and not in press releases issued by the Yonkers Police Department or the news article referenced in the Second Amended Complaint.  *See id.* at 40:25-41:8 ("Q.  Okay.  My point is that when you use the term fentanyl in your lawsuit, it's based on the statements that you say you heard at the scene rather than the statements in press releases issued by the Yonkers Police Department in the article, in other words.  Is that correct?  A.  Yes.").  Plaintiff also testified that there were no other people at the scene, other than Plaintiff himself and the Yonkers police officers, who would have heard what the police officers said about fentanyl exposure.  *See id.* at 41:9-42:10 ("Q.  So would it be fair to say, then, that if the officers used the term fentanyl to talk about what happened at the scene, you were the only person who heard that?  A.  Yeah.  I'm the only person and the officers.").  And Plaintiff acknowledged that the news article referenced in the Second Amended Complaint did not even use the word fentanyl.  *See* Pl.'s Dep. at 40:8-41:8; https://bronx.news12.com/police-several-yonkers-officers-recovering-after-possible-drug-exposure [https://perma.cc/C85K-MKDU] (last visited September 5, 2025).

In addition, while there are references to fentanyl in the Incident Report and other documentation generated by Yonkers police officers, *see* Ashraf Decl. Exs. B, C, those

documents were not made available to the public until they became necessary parts of this motion.  Thus, even if a statement by police officers connecting Plaintiff to fentanyl exposure can be deemed sufficiently derogatory to have injured Plaintiff's reputation, the fact that no such statement was publicized is sufficient for Plaintiff's "stigma plus" claim to fail.[14]

Moreover, even if there were a material issue of fact regarding whether statements by Officer Cox, Officer Gallagher, and/or Commissioner Mueller about Officer Cox and Officer Gallagher being exposed to fentanyl due to their interaction with Plaintiff were made public and harmed his reputation—that is, even if Plaintiff could satisfy the first prong of the "stigma plus" claim—there is no evidence in the record to establish the second prong of the claim, *i.e.*, that Plaintiff suffered "a material state-imposed burden or state-imposed alteration of [his] status or rights." *Vega*, 596 F.3d at 81.  At most, Plaintiff maintains that the news article—which does not even mention fentanyl—hurt his reputation because, as Plaintiff testified, "if I wanted to go get a job and somebody looks me up – decide to look me up, they're going to be like, Oh, we don't want to hire that guy."  Pl.'s Dep. at 46:21-24.  Plaintiff added,

> I even had a officer in the county tell – told – that's how I know I was on the news 'cause he told me.  He was like, Yo, that's messed up how they put you in the news like that.  And I have friends calling me a crackhead and all that type of stuff which I never even touched that drug a day in my life.

*Id.* at 47:4-11.

But as set forth in the May 16, 2022 Order to Amend in this case regarding the "plus" element of the "stigma plus" claim: "'The 'plus' imposed by the defendant must be a specific

---

[14] Furthermore, even if the statements at issue could be deemed to have been publicized, Plaintiff's testimony about the officers who made statements at the scene regarding fentanyl and the timing of those statements strongly suggest that neither Officer Cox nor Officer Gallagher made the statements, in which case the "stigma plus" claim against them also would be subject to dismissal based on their lack of personal involvement in the alleged constitutional violation.

and adverse action clearly restricting the plaintiff's liberty—for example, the loss of employment, or the termination or alteration of some other legal right or status.'" ECF No. 5 at 4 (quoting *Velez v. Levy*, 401 F.3d 75, 87-88 (2d Cir. 2005)) (cleaned up). Plaintiff did not allege, or testify to, any restriction or deprivation of a liberty or property interest that resulted from any stigmatizing statements Officer Cox, Officer Gallagher, and/or Commissioner Mueller might have made. What Plaintiff has asserted here as the potential "plus" factor is limited to reputational harm that might theoretically impact him in the future. This is plainly insufficient, as it is well settled that "deleterious effects flowing directly from a sullied reputation, standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine." *Sadallah*, 383 F.3d at 38.

For all of these reasons, the Individual Defendants are entitled to summary judgment on Plaintiff's "stigma plus" claim, and their motion as to this claim is GRANTED.

## III.    Municipal Liability Claim

### A.    Applicable Legal Standards

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 , 691 (1978). Thus, "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *accord Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 636 (S.D.N.Y. 2015). Such claims for municipal liability are often referred to as "*Monell* claims."

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'"  *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003) (summary order).  A plaintiff may satisfy the "policy or custom" requirement by proving one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Buari v. City of New York*, 530 F. Supp. 3d 356, 397-98 (S.D.N.Y. 2021) (collecting cases).  In addition, to prevail on a *Monell* claim, a plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("Governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

### B.    Analysis

Here, Plaintiff attempts to allege municipal liability by alleging that the City of Yonkers Police Department and Commissioner Mueller "developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of person [*sic*] in the City of Yonkers N.Y. which caused the violations of Plaintiff rights."  Second Am. Compl. Third Cause of Action ¶ 2.  Specifically, Plaintiff alleges that "[i]t was policy and/or custom of City of Yonkers Police Department and Commissioner John Mueller to inadequately and improperly arrest suspect without probable cause, frame-up suspect, manufacture flase [*sic*] evidence,

conduct suggestive and tainted identification procedures, racial profile, and acts of misconduct were intead [*sic*] tolerated by City of Yonkers Police Department and Commissioner John Mueller." *Id.* Third Cause of Action ¶ 3.

As an initial matter, to the extent Plaintiff purports to assert his claim for municipal liability against Commissioner Mueller in his individual capacity, that claim must be dismissed. While a *Monell* claim may be asserted against a municipality based on the actions of an individual policymaker, the responsible party for a *Monell* claim is the municipality itself, not the individual. *See Amory v. Katz*, No. 15-cv-01535 (VAB), 2016 WL 7377091, at *5 (D. Conn. Dec. 19, 2016); *Acquah for J.B. v. City of Syracuse*, No. 18-cv-1378 (LEK) (DEP), 2020 WL 1510405, at *2 (N.D.N.Y. Mar. 30, 2020).

With respect to the City of Yonkers, any claim for municipal liability that Plaintiff is attempting to assert must be dismissed because Plaintiff's excessive force and "stigma plus" claims are being dismissed here. "A prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor." *Wiltshire v. Wanderman,* No. 13-cv-9169 (CS), 2015 WL 4164808, at *4 (S.D.N.Y. July 10, 2015) (cleaned up). "Thus, a court granting summary judgment for the defendants on the underlying constitutional claim must also grant summary judgment on the associated *Monell* claim." *Id.* (quotation marks omitted). Because Plaintiff's underlying constitutional claims are being dismissed, his claim for municipal liability must also be dismissed.

As previously noted, however, the City of Yonkers has not moved for summary judgment. *See* footnote 1, *supra*; ECF No. 84 (notice of motion); *see also* ECF No. 87 at 1 ("Defendants City of Yonkers *Police Department*, John Mueller, Commissioner, Michael Cox, Officer, and Ian Gallagher, Officer (hereinafter Defendants), move for summary judgment . . ."

(emphasis added)).  Rather, as in *Wiltshire*, *supra*, "defense counsel seems not to have noticed that the City [of Yonkers] is a Defendant."  2015 WL 4164808, at *3.  Nevertheless, because Plaintiff cannot establish *Monell* liability for the reasons discussed in this section, granting summary judgment in favor of the City of Yonkers *sua sponte* on the municipal liability claim is appropriate.

"District courts have the power to enter summary judgment *sua sponte* only if the losing party was on notice that it had to come forward with all of its evidence."  *Id.* (quotation marks omitted).  "A *sua sponte* award of summary judgment may well be appropriate if it is clear that all of the evidentiary material a party might submit is before the court and no material issue of fact exists."  *Id.* (quotation marks omitted).  "When the losing party is *pro se,* the Court must also satisfy itself that the *pro se* litigant is aware of [the] requirements" of Rule 56 of the Federal Rules of Civil Procedure.  *Id.*  "But the court need not advise a *pro se* litigant as to the nature of summary judgment where an opposing party has already provided the litigant with the requisite notice, or where the record otherwise makes clear that the litigant understood the nature and consequences of summary judgment."  *Id.* (quotation marks omitted).

Here, as noted above, the Individual Defendants provided Plaintiff with the Notice to *Pro Se* Litigants Opposing Summary Judgment required by Local Civil Rule 56.2 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York; Plaintiff was therefore made aware of both the requirements of Rule 56 and the consequences of summary judgment.  The Individual Defendants also briefed the issue of *Monell* liability, and therefore placed Plaintiff on notice that this was an issue that he would need to address, and produce evidence to support, in his opposition papers.  In sum, Plaintiff was on notice that he was required to come forward with evidence regarding all of his claims.

Because Rule 56(f) of the Federal Rules of Civil Procedure allows a court to grant summary judgment for a nonmovant only "[a]fter giving notice and a reasonable time to respond," Fed. R. Civ. P. 56(f), the Court will give Plaintiff until October 10, 2025 to show cause why summary judgment should not be entered in favor of the City of Yonkers on his *Monell* claim. *See Wiltshire*, 2015 WL 4164808, at *4.

## IV.    State Law Defamation Claim

### A.    Applicable Legal Standards

"Defamation is 'the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him [or her] in the minds of right-thinking persons, and to deprive him [or her] of their friendly intercourse in society.'" *Williams v. Buffalo Public Schs.*, 758 F. App'x 59, 64 (2d Cir. 2018) (summary order) (quoting *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996)).[15]  "The elements of a defamation claim are (1) a false statement that is (2) negligently, at minimum, (3) published to a third party (4) without privilege or authorization, and that (5) causes harm, unless the statement is *per se* defamatory." *Id.* at 64-65.

---

[15] While Plaintiff has not specifically identified under what law he brings his defamation claim, the Court considers Plaintiff's defamation claim to be asserted under New York state law. The allegations in the Second Amended Complaint reiterate almost verbatim the definition of defamation found in New York case law, *i.e.*, that he suffered a "defamation of character by which false statement tends to expose the Plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons and to deprive him of their friendly intercourse in society." *See, e.g.*, Second Am. Compl. First Cause of Action ¶ 12.  In addition, Plaintiff testified at his deposition that at the time of the incident he lived in the Bronx, New York, *see* Pl.'s Dep. at 44:5-11, and the allegedly defamatory statements were made in Yonkers, New York by Yonkers police officers.  Therefore, the claim should be governed by New York law.  *See Wiltshire*, 2015 WL 4164808, at *5 n.8 ("Given that Plaintiff appears to have been a New York resident at the time of his arrest, Defendants are a New York municipality and its employee, and all of the events at issue in this case, including the allegedly defamatory statements contained in the police report, took place in New York [the Court] find[s] that New York law governs Plaintiff's defamation claim.") (citations omitted).

Pursuant to New York's General Municipal Law,

> [n]o action . . . shall be prosecuted or maintained against a city . . . for personal injury . . . alleged to have been sustained by reason of the negligence or wrongful act of such city . . . or of any officer, agent or employee thereof . . . unless . . . a notice of claim shall have been made and served upon the city . . . in compliance with section fifty-e of [the New York General Municipal Law].

N.Y. Gen. Mun. Law § 50-i(1). The General Municipal Law also provides that for "any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action . . . against a public corporation, . . . or any officer, appointee or employee thereof, the notice of claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises . . . ." *Id.* § 50-e(1)(a). "Such notice of claim is a condition precedent to the maintenance of an action against such government entities." *Wiltshire,* 2015 WL 4164808, at *5 (quotation marks omitted); *see also Brown v. City of New York*, No. 18-cv-3287 (JPO), 2020 WL 1819880, at *7 (S.D.N.Y. Apr. 9, 2020) ("Under New York law, a plaintiff asserting tort claims against [a municipality] or its employees must file a notice of claim within ninety days after the incident giving rise to the claim and commence the action within a year and ninety days from the date of the incident. *See* N.Y. Gen. Mun. Law §§ 50-e(1)(a), 50-i(1). A plaintiff's failure to comply with the mandatory New York statutory notice-of-claim requirements generally results in dismissal of [his or] her claims.") (cleaned up).

### B.    Analysis

To the extent that Plaintiff asserts a defamation claim based on statements made by Officer Cox, Officer Gallagher, and Commissioner Mueller, such statements allegedly were made on May 7, 2021, the date on which his encounter with members of the Yonkers Police Department occurred, or, in the case of Commissioner Mueller, on May 8, 2021, when the news article was published. There is no allegation in any of Plaintiff's pleadings, nor is there any

evidence in the record, that Plaintiff *ever* filed a notice of claim regarding his defamation claim, let alone that he filed one within 90 days after the claim arose (*i.e.*, August 5 or August 6, 2021). Accordingly, Plaintiff's defamation claim against Officer Cox, Officer Gallagher, and Commissioner Mueller must be dismissed for failure to comply with the notice of claim requirement. *See Culbreth v. Manuel*, No. 24-cv-497 (PMH), No. 24-cv-2148 (PMH), 2025 WL 35059, at *8 (S.D.N.Y. Jan. 6, 2025).

Because the Court concludes that Plaintiff's defamation claim against Officer Cox, Officer Gallagher, and Commissioner Mueller must be dismissed based on Plaintiff's failure to file a notice of claim, it also is appropriate to grant summary judgment to the City of Yonkers *sua sponte* on this same basis, to the extent Plaintiff is seeking to hold the City of Yonkers liable for defamation on the basis of *respondeat superior*.[16]  Again, however, because the City of Yonkers itself has not moved for summary judgment, and in accordance with Rule 56(f), the Court gives Plaintiff until October 10, 2025 to show cause why summary judgment should not be entered in favor of the City of Yonkers on the defamation claim. *See Wiltshire*, 2015 WL 4164808, at *5.

## CONCLUSION

For the reasons stated above, the Individual Defendants' motion for summary judgment (ECF No. 84) is GRANTED, and all claims against Officer Cox, Officer Gallagher, and Commissioner Mueller are dismissed.

---

[16] "[U]nlike cases brought under § 1983, municipalities may be liable for the common law torts . . . committed by their employees under the doctrine of *respondeat superior*." *Williams v. City of New York*, No. 23-cv-2700 (JPO), 2024 WL 3967307, at *15 (S.D.N.Y. Aug. 28, 2024) (quotation marks omitted).

**By no later than October 10, 2025**, Plaintiff may show cause, in writing and supported by evidence, as to why the Court should not grant summary judgment in favor of the City of Yonkers on all claims asserted against the City in this matter, which are now the only claims remaining in the case.  If Plaintiff fails to do so, the Court will dismiss the remaining claims.

The Clerk of Court is respectfully directed to terminate Officer Cox, Officer Gallagher, and Commissioner Mueller as parties in the case.

Dated:  September 9, 2025
       White Plains, New York

**SO ORDERED.**

_____
ANDREW E. KRAUSE
United States Magistrate Judge

A copy of this Opinion and Order has been mailed to the *pro se* Plaintiff by Chambers staff at his address of record on the docket.